I understand counsel are present in all cases except Ms. Mahaney, who is proceeding pro se, and we'll hear her if she gets here, of course. We'll hear argument in United States v. Brown. Good morning, Mr. Wallenstein. John Wallenstein v. Lawrence Brown. This is not a very good case. Factually, two robberies, both with alleged guns being displayed. But the real issue here, the two main issues which I've briefed, are the question of whether or not what appeared to be a gun displayed by Mr. Brown during the robbery at Rite Aid on November 14th of 2013, whether that was in fact a real firearm. If it was not a real firearm, and if the jury was not entitled to so find, then that second 924C charge must fall. And that would eliminate the 25-year consecutive sentence which Mr. Brown received on that count. There is no evidence of the veracity of that firearm. That's not the right word. But the evidence of the Rite Aid robbery was primarily from the store manager who was in the room with the robber, who identified what appeared to be a pistol, who said it was a black gun. That was all she could say about it. Yes, it is seen on video of the events in that room. The object is seen, but there is no proof that it is a real firearm. Surely the law is not that some poor store clerk has to be a firearms expert in order to testify that this person came in and pointed a firearm at me. I don't believe that. The law requires that, as you say, some poor— What's the difference between that and what occurred here? Well, because in order to be guilty of the robbery, the defendant displays what appears to be a firearm is sufficient. But for the 924C count, standing alone, it has to be a real firearm. The statute makes no distinction there. The statute says 921 defines firearm. When you take the evidence from the second robbery, from the Shop Rite robbery, does that not provide some evidence that the gun in the first robbery was a real one? I mean, there was stronger evidence in the second robbery. There certainly was, but I think— Given all the other similarities, does the fact that the second robbery also used a black gun provide some evidence as to the first robbery? I don't think it does, Judge Chin. I think that the evidence of the second robbery stands alone. It proves whatever it proves with respect to the Shop Rite robbery. But remember, these two robberies are separated by five months, and they're separated geographically as well. The Rite Aid robbery occurs first in November of 2013 in New Windsor, and the Shop Rite robbery occurs in April of 2014 in Newburgh. So there's no—I certainly don't think that the proof that Brown possessed a firearm in the second one— How far apart are the two cities? New Windsor is a—I couldn't tell you precisely, but I know it's a suburb of Newburgh. It's within Orange County, five, ten miles maybe. It's not that far geographically, but it's certainly— That would be like a robbery here and then one being uptown, right? I think it's a little bit further than that, but I'm not sure. Something like that. Maybe here to Brooklyn, but not downtown. I do think, though, that the temporal separation, the five months, is more significant than the geographical separation. And the Shop Rite robbery occurs second. So, while there is proof in the second robbery that it was an actual firearm, and that's the proof of Mr. Hamilton, who says, I know about guns, I saw the bullets in the cylinder. That's, frankly, from my position, tough to argue with. And I will concede that that is sufficient for a jury to find that it was a real firearm. But there's no such proof in the Rite Aid robbery. The Rite Aid robbery involves one witness testifying that he pointed a gun at me. It was stuck in my back, and then I saw it. It was displayed, apparently, when he poked at the DVR with it. There's no proof that it's the same gun. There's no proof that it's the same type of gun. It's an object held in his hand that appears to be a pistol. I wanted to address the photo array for a moment, if I might. Although Judge Roman found that the photo array was not in and of itself suggestive, I respectfully disagree. And if you look at the photographs, which are included in the appendix, the photograph of Mr. Brown has what clearly appears to be a spotlight on his face. I mean, they literally spotlighted that photograph, and that does not appear in any other photo. And the witness who viewed the photo array, he didn't testify at a hearing, but in the detective's declaration, he said that the witness immediately discarded four of the six photographs, saying those don't look anything like the guy, the nose is totally different. That leaves Mr. Brown and one other photograph, and then you have this spotlight on Mr. Brown's face. I think that the photograph is clearly suggestive under any stretch of the imagination, under any definition of that word. And I think that Judge Roman should have, rather than denying the motion without a hearing, should have at least granted a hearing where that could have been explored. I give you that at trial. Mr. Rinaldo was able to cross-examine with respect to that issue, and the witness did testify at trial and identified Mr. Brown at trial. But if the photograph itself was suggestive, that would require a hearing in order to determine whether there was essentially an independent source for that in-court identification. So how do we review the photographs? I just want to make sure we're all on the same page. They are – no, I'm sorry, I know where they are. What's the standard we apply to reviewing your argument? That's kind of where I'm going. They are to be reviewed, I think, under – just simply to determine. It's a factual determination, and it's a question of whether or not Judge Roman abused his discretion in determining that this was not suggestive. And I think that – I think you just basically have to look at them and say, well, they are suggestive, and therefore he should have gone the other way and granted a hearing. How about independent source? Is that for us to decide or not? I think you have to have a hearing first, Judge Walker – Judge Newman, I'm sorry. Judge Walker was in that spot last week. I think that the independent source has to be explored at a hearing by having Mr. Adams come in at that hearing. The first determination has to be whether the photographs were unduly suggestive. If they were, then you have to explore the independent source in a hearing, which Mr. Adams can then testify as to why he identified Mr. Brown, other than from looking at that spotlighted photograph. Aren't the photos remarkably similar in other respects in terms of roughly age, beard, shaved head, orange jumpsuit? They are. I agree with that, Judge. And it was – and Judge Roman found that. They were fairly similar in respect of that, skin tone, complexion, and as you said, facial hair, shaved head, and orange jumpsuits. But the fact of the spotlight on Mr. Brown, and neither the detective nor the civilian witness, Mr. Adams, claimed to have noticed that prior to Mr. Ronaldo pointing it out during cross-examination in front of the jury during the trial. So I think that even though they were similar in that respect, if it weren't for that spotlight, I don't think I'd be making this point. But I think that that in and of itself is sufficient to create a suggestiveness. Thank you, Mr. Wallenstein. Thank you, Judge. You have three minutes for rebuttal. Yes, sir. Ms. Nichols? Thank you. May it please the Court. Allison Nichols for the United States. I represented the United States both on appeal and at trial in this case. Good morning, Your Honors. The judgment of the district court here should be affirmed in all respects. There is no basis here to disturb the jury's verdict that there was sufficient evidence at trial to convict this defendant beyond a reasonable doubt on all counts. And the district court did not err in denying Mr. Brown's motion to suppress here. So I'll start with the firearm evidence. As Mr. Wallenstein has conceded, the evidence that the firearm used in the ShopRite robbery that it was a real gun was extraordinarily compelling in this case. The eyewitness testified that he had familiarity with firearms. And because of the angle with which Mr. Brown pointed the gun at the eyewitness, he was able to see the bullets in the cylinder of the gun. That's the ShopRite? That's the ShopRite robbery, correct. I don't hear your adversary disputing that in substance. So take us from there to the Rite-Aid. Absolutely, Your Honor. So we also have testimony from the manager at the Rite-Aid robbery that she saw a gun and that it was black, which is consistent, although much less detailed than the testimony of Zachary Hamilton at the ShopRite robbery. We also have video surveillance of both the robberies. And you can see on the video that the gun appears to be the same weapon. It is a similar size, and the robber is holding it in a similar way. And that is an inference that the jury was well within the bounds of reasonableness to draw here, that, in fact, those guns were the same. If he did not have the evidence from the second robbery, would the evidence in the first robbery be enough? Yes, Your Honor. I think the law is clear that eyewitness testimony is sufficient, that there's no specific type of testimony or expertise that's required in order to find a real firearm. But, Your Honor, I do think that the evidence from the second robbery is important to consider when we're looking at the evidence from the first robbery. His possession of a real firearm about five months later is extremely probative of both his familiarity with firearms and his ability to access them. I'd just like to play out for a moment the string of inferences that the jury would have had to make to conclude otherwise. They would have had to conclude that, in November 2013, Brown had a real-looking toy gun, and he used that to rob the riot aid in November 2013. And then, in the intervening five months, he obtained a real gun that he used in the ShopRite robbery that looked very much the same, the same color, the same size, and that he held in a similar way and handled in a similar fashion as the toy gun that he'd used previously in a robbery that otherwise proceeded very similarly. And the jury's choice of the competing inference here, that instead that Brown used, in fact, the same real gun in both robberies, is certainly not unreasonable. Judge Roman instructed the jury properly on the definition of firearm, and I want to be clear that this argument that the firearm was not real was presented to the jury, and they rejected it by their verdict. I'd like to address the photo array briefly as well. Council has referred to the lighting as a spotlight, and I just want to be clear that what we're talking about is that there was a glare on the defendant's forehead in the picture, probably from the flash. The standard of review here, Your Honors, is for clear error, and the court can also review the photo array directly in determining its fairness. Here, as Your Honors have pointed out, the photo array is very good. I mean, the people look remarkably alike. They're dressed the same. They appear to be of similar ages, similar hair, similar facial hair, similar skin tone. And so this is just simply not a case where the difference in the lighting suggested to the witness that the defendant was more likely to be the culprit. I think it's important to note that Brown had multiple defense attorneys who apparently didn't notice this difference in lighting. It was not raised in his initial motion to suppress. Judge Roman didn't notice the lighting until it was pointed out by trial counsel. And both the eyewitness and the police officer who administered the photo array testified that they didn't notice the difference in lighting until it was pointed out by trial counsel. What's the fact that we, or set of facts, that we review for clear error? Judge Roman's decision that this is not suggestive? Yes, Your Honor. Although we're allowed, permitted, in our capacity on appeal, to review whether it is suggestive. You're permitted to review the photo array itself in assessing its fairness. And I think that's sort of... Which informs our decision as to whether there's clear error. Absolutely, Your Honor. You'd agree it's different. I would agree that it's different. I do agree that there is glare on the defendant's forehead in this picture. But I think it's important to note that the lighting in the photos was not otherwise uniform. And as Judge Roman pointed out in denying the defendant's renewed motion to suppress, you could easily make the opposite argument about the photo that was the darkest in the batch of them. Well, as I look at it, there's no lighting on any of the others. It's not just that it's dark. There's no lighting indicated on the others, is there? It is absolutely the case that the defendant's is the brightest. But I think that the other five are not necessarily exactly the same. I think that there is one in particular that is darker than the other four. Can I ask you about the sentencing? Yes, Your Honor. Is there any indication that the sentencing judge understood he had the option to consider the mandatory nature of the gun charge in deciding the length of the sentence of the Predicate Act? I believe that that argument was before him, Your Honor. I think that counsel made the argument that essentially 32 years was sufficient but not greater than necessary and asked for, as he does here on appeal, a sentence of one day on both of the robberies. He made the argument, but is there anything in the record that indicates the judge understood he had discretion to consider that? Judge Roman didn't particularly articulate that he had that understanding. What he said is that... Required that he... Well, first place, do you agree he does have discretion to consider that? Yes, Your Honor, he does have that discretion. Wasn't there a Second Circuit opinion at the time that said he couldn't? I'm sorry? Wasn't there a Second Circuit opinion at the time that said he could not? My understanding is that he could consider that but that he doesn't have to, Your Honor. No, my question was, was there a Second Circuit opinion at the time that said he could not? I'm not aware of that. Well, if that was the case, isn't that some reason to think he is presumed to know the law and would have thought he didn't have discretion? I think that the judge indicated that he had heard the arguments of parties and that he had considered the 3553A factors and that he was imposing sentence based on the arguments that he had heard. And what the government argued at sentencing was that these crimes were very reckless and that they were very serious and that they warranted a guideline sentence. Is it fair to say the Supreme Court's decision in Dean was not discussed at all? That's fair to say, yes, Your Honor. It wasn't brought to his attention by the government? That's correct. Do you think it should have been? I think that Judge Roman considered the 3553A factors and the guidelines in fashioning a sentence, and I think it's important to consider that the seven-year sentence for the robberies was . . . What's the date of the sentencing? Maybe the sequence is different than I understood. Do you have the date of the sentencing? January 12, 2018. Oh, okay. So that is after the Dean decision. Was the government . . . let me back up a minute. Was the government aware of the Dean decision? Yes, Your Honor, and that decision was before the sentencing. Right, so the government was aware of it. Yes, Your Honor. You don't think you should have alerted the district court to it? Perhaps we should have, Your Honor. Perhaps we should have made a more fulsome record of the nature of what the court should and could consider. The probation office in this case recommended a sentence of 60 months, which was a slightly below-guideline sentence for the two robberies, and Judge Roman imposed a guideline sentence of 84 months. Did the pre-sentence report refer to the Dean decision? I don't believe that it did, Your Honor. The district court understood that it could go down to a day on the two robbery counts? Absolutely, Your Honor. How is that clear from the record? That's clear from the arguments of the parties. In particular, the defendant was asking for such a sentence. The government . . . go ahead. The government didn't respond that the court did not have the discretion to do that, right? No, we did not. We simply argued that under 3553A, that's not the decision that he should make within his discretion. How does the argument of counsel inform us what the court was aware of? The court articulated on the record that he had considered the arguments of counsel in fashioning an appropriate sentence. Thirty-two years for these two robberies does seem like a really high sentence. It's a very significant sentence, Your Honor. That's absolutely the case, but I think it is important to . . . It's not shockingly high in the government's view. No, Your Honor. In our view, it is not shockingly high. It is not a manifest injustice, and I do think that it's . . . Because? I do think that it's important to separate out the mandatory sentences for the gun charges from the seven-year guideline sentence for the robbery charges. Wouldn't the safest thing be to send it back so the judge could read the deemed decision and then, with that clearly in mind, decide does he wish to reduce the underlying offense sentence? Wouldn't that be the safest thing? Well, Your Honor, I will observe that the defendant is not asserting that the sentence was procedurally unreasonable. So, any argument there is waived here, and I think the question is really is it substantively unreasonable? And here, as I said, these were very reckless crimes. They had a very real and tangible effect on the community. The defendant tied up his victims. He held some of them for hours. I understand. It may be that if the judge had said, I've read the deemed decision. I fully understand it. I'm fully aware of my power. Nonetheless, I choose to give 7 plus 25. You would have had no argument for me on that at all. That isn't this record, is it? No, it's not, Your Honor. So, should we get that record so that we are at least satisfied that he fully understood what he could do? I don't believe that there is any reason to question that the district court did understand what he could or couldn't do on the record, Your Honor. No reason to question, but no reason to be sure he did either. I think that's fair, Your Honor. Thank you. Thank you, Ms. Nichols. Mr. Wallenstein. Thank you, Your Honor. You have reserved three minutes. Yes, sir. I just want to point out a couple of points here. Ms. Nichols argues that there is compelling evidence that there was a real firearm during the Shoprite robbery, and, ergo, there was a real firearm during the Rite Aid robbery because the robber was holding the gun in a similar way. And she argues that it's not realistic to think that he had a toy gun in November but a real gun in April. And I respectfully disagree with Ms. Nichols on that count. It is well within the realm of possibility that the robber had a replica gun, a toy gun, if you will, in November and obtained a real gun in the next five months. That certainly is something that can happen and does happen, unfortunately, these days. And the fact that a gun in November looks similar to a gun in April doesn't make it the same weapon. And there is no evidence that the ---- Was this point argued to the jury, that is, whether it was a toy gun? I believe that Mr. Rinaldo argued that there was no proof that it was a real gun rather than ---- I don't know that the government argued that it was, in fact, real. They made the same argument then that they're making now. In fact, I think it was Ms. Nichols who made the argument. I believe that Mr. Rinaldo made a similar argument, that there was no proof that the two guns were the same. And that's the argument here. There's no proof that it was the same gun both times. There's some proof. They look the same. Well, yeah, but that doesn't make them the same. And unless it's a real firearm ---- I don't have proof that you need. I mean, the jury hears the arguments. I mean, did anybody argue that that wasn't a real gun, that they got it wrong in the Shoprite second robbery? You can't even tell that that's a real gun just because somebody sees some bullets or the ends of bullets in the chamber. I don't know that that argument was made, Your Honor, but I do concede that the Shoprite robbery, that the evidence that it was a real gun based on Mr. Hamilton saying, I know about guns, I've seen guns, and I saw the bullets and I had sufficient time to observe it, I think that that's sufficient for a jury to conclude that it was real. But that's not what we have in the Rite Aid robbery where we have a woman who says ---- Look at that. It's a black gun. There are pictures of them, right? The jury did see the videos, yes. But you can't tell whether it's the same gun or it may be similar or it may not be. I don't know. Is that up to the jury or are you just saying as a matter of law they're too dissimilar for the jury to have that evidence? I think there's insufficient evidence in the Rite Aid robbery for the jury to come to that conclusion. With respect to the ID, and I see the red light has gone on, I just point out that it's a lot more than just a little extra lighting on his forehead. The photograph when you have the color one clearly shows the center of his face lit up in bright yellow, and that makes a difference. It's difficult to tell on the copy that you have, Judge Newman, because that's in black and white, but in the ECF filed appendix there is the color photograph. Thank you. Thank you, Your Honors. Thank you both. We'll reserve decision in this case.